**CITY OF PHILADELPHIA, Petitioner**

v.

**WORKERS' COMPENSATION APPEAL BOARD (SMITH), Respondent.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs Aug. 13, 2004.

Decided Oct. 18, 2004.

Martin G. Malloy, Philadelphia, for petitioner.

Daniel F. Ashton, Fort Washington, for respondent.

BEFORE: PELLEGRINI, Judge, and LEAVITT, Judge, and McCLOSKEY, Senior Judge.

OPINION BY Judge LEAVITT.

The City of Philadelphia (Employer) petitions for review of an adjudication of the Workers' Compensation Appeal Board (Board) that denied Employer's termination and utilization review petitions. In doing so, the Board affirmed the decision of the Workers' Compensation Judge (WCJ) that Eddie Smith (Claimant) had not recovered from his 1998 work-related injury to his lower back and that his continuing treatment was reasonable and necessary. The Notice of Compensation Payable (NCP) defined Claimant's injury as a "lower back strain," and the central issue is whether the WCJ properly changed the NCP to include "herniated discs and post-traumatic lumbar radiculopathy" where there was no evidence in the record that these conditions existed when the NCP was issued.

Claimant, who is approximately 50 years old, has been employed at the Philadelphia Water Department since 1989 as an industrial plant technician. As such, Claimant's job was to maintain the electrical equipment at the water plant. On February 28, 1998, Claimant began to climb a scaffold when it tilted. Claimant and a co-worker decided to use steel I-beams to stabilize the scaffold, and in the course of lifting an I-beam, Claimant injured his back. He was taken to Hahnemann Hospital, and the following day he was seen at Employer's clinic. Claimant continued to work for Employer in a light-duty position until June 15, 1998. At that point, Claimant stopped working and used accumulated

sick leave, vacation time and administrative leave.

On June 11, 1998, Employer issued an NCP that described Claimant's injury as a "lower back strain." Reproduced Record at 1a (R.R. ———). On October 12, 1998, Employer filed a termination petition asserting that Claimant had recovered as of September 9, 1998. On April 21, 1999, Employer filed a utilization review petition with respect to the treatment provided to Claimant by Mark D. Avart, D.O.[1] Claimant denied the allegations in the petitions, and the petitions were assigned to a WCJ for a decision.

In support of its petitions, Employer presented the 1999 deposition testimony of William F. Bonner, M.D., who is board certified in physical medicine and rehabilitation. Dr. Bonner examined Claimant on July 7, 1998, at which time Claimant provided a complete medical history. Dr. Bonner found Claimant's nerves and arteries to be intact, and his leg muscles to be normal. Claimant did not complain of tingling in the toes or feet, but Claimant reported pain when Dr. Bonner tried to flex Claimant's hip, move his knee, or extend his ankles. Claimant also complained of pain in the low back area when Dr. Bonner pressed down on his skull and shoulders, leading Dr. Bonner to conclude that Claimant exaggerated his pain responses.

Thereafter, Dr. Bonner reviewed an electromyogram (EMG) performed on Claimant on July 14, 1998, which showed an absence of nerve impairment or radiculopathy. He also reviewed an MRI done on Claimant in March 1998, which showed spondylosis[2] of L5–S1 on both sides and spondylolisthesis[3] of L5 and S1 at a grade one, meaning minimal. According to Dr. Bonner, these conditions were most likely present since birth.

Dr. Bonner opined, within a reasonable degree of medical certainty, that Claimant suffered from degenerative joint disease; that Claimant had a history of a lumbar strain that had resolved;[4] and that Claimant magnified his symptoms. Further, Dr. Bonner opined that Claimant's degenerative joint disease was not caused by Claimant's work-related accident. Dr. Bonner released Claimant for full duty work on September 2, 1998.

Employer also presented two separate depositions of I. Howard Levin, M.D., a board certified neurologist, and a report prepared by Dr. Levin on September 11, 2000. In his first deposition, given in December 1998, Dr. Levin testified as follows. Dr. Levin saw Claimant on September 17, 1998, at which visit Claimant complained of constant pain in his lower back and some pain in his legs. Claimant groaned throughout Dr. Levin's physical examination, but Dr. Levin did not find any objective evidence of neurological impairment. Claimant exhibited some "give away" weakness in his lower extremities and diminished sensation on the entire left half of his body; however, these symptoms did not fit a lower back problem. Claimant's reflexes were normal. A series of Waddel's tests on Claimant were positive, indicating that Claimant embellished his

---

1. Dr. Avart is a board-certified orthopedic surgeon licensed to practice in Pennsylvania.

2. Spondylosis is a stiffening of the vertebra, "often applied non specifically to any lesion of the spine of a degenerative nature." Stedman's Medical Dictionary at 1678 (27th ed.2000).

3. Spondylolisthesis is a "forward movement of one of the lower lumbar vertebrae on the vertebra below it." *Id.*

4. Claimant reported that his spine was earlier injured in 1988.

symptoms. Other tests were negative for sciatica and for radiculopathy.

Dr. Levin also reviewed Claimant's EMG and MRI; like Dr. Bonner, he concluded that Claimant's spondylosis and spondylolisthesis were longstanding, not acute and could not account for Claimant's complaints. At the conclusion of his first deposition, Dr. Levin opined, within a reasonable degree of medical certainty, that Claimant did not have any medical condition upon which to base his complaints. There was no objective evidence of any physical or neurological impairment. There was no evidence of any residual or current problems as a result of the accident of February 28, 1998. Dr. Levin also released Claimant to return to his pre-injury duties without restrictions.

Dr. Levin gave his second deposition on February 12, 2001, after reviewing additional medical records on a discogram and discectomy performed on Claimant in 2000. Dr. Levin testified that he agreed with some of the operating physician's diagnoses. Specifically, Dr. Levin agreed that Claimant had long-standing lumbar disc degeneration and spondylolisthesis, but Dr. Levin did not believe they were related to Claimant's work-related injury. Dr. Levin found no evidence of lumbar root irritation in the records; indeed, the discogram performed on Claimant by his surgeon was negative. Accordingly, Dr. Levin opined that Claimant's surgery was neither reasonable nor necessary.

Dr. Levin also opined on the reasonableness of Claimant's treatment by Dr. Avart. Dr. Levin was critical of the quality of Dr. Avart's notes because they did not record all the treatments prescribed or the reasons for those treatments. Dr. Avart prescribed oral steroids, but Dr. Levin noted that these medications were contraindicated for Claimant's symptoms relating to his spondylolisthesis. Dr. Levin also opined that Dr. Avart's prescribed back support and traction were of no value for a musculoskeletal injury to the back; no controlled study had ever demonstrated a benefit from these devices. Dr. Avart's long-term prescription of narcotics, Oxycontin and Oxy–IR, were inappropriate, in Dr. Levin's view, because of the risk of drug habituation. Dr. Levin testified that Dr. Avart's cortisone injections, a controversial course of treatment in any case, are used to address a musculoskeletal problem. On the other hand, a musculoskeletal problem is not treated by surgery. Stated otherwise, Dr. Levin failed to find any consistency in Dr. Avart's treatment of Claimant. If Claimant required surgery for radiculopathy, then Dr. Avart's cortisone injections made no sense. Dr. Levin also could not understand why Dr. Avart referred Claimant to Dr. Bowden, a general practitioner, whose treatment of Claimant was duplicative of Dr. Avart's. In any case, Dr. Levin noted that Dr. Bowden did not report any physical or neurological impairment or lumbosacral radiculopathy in Claimant. Finally, there was no evidence that Dr. Avart's treatment improved Claimant. For these reasons, Dr. Levin opined that Dr. Avart's treatment was neither reasonable nor necessary.

Employer presented the testimony of Mr. Frank Gola, who worked for the Philadelphia Water Department as a water pollution control plant maintenance supervisor, as he had since 1984. Gola placed Claimant in a light-duty position after his February 28, 1998 injury, where Claimant worked from April 28, 1998 to June 15, 1998. Claimant's job involved collecting reports in different binders, organizing them by date and equipment category and then placing them in a file box. Other workers moved the file boxes to their final destination. To accommodate Claimant, Gola permitted Claimant to walk around

whenever he wanted. Other employees were available to help Claimant with heavy lifting, if it had to be done, but none was required.[5] Claimant's work site was on the ground floor. Gola's testimony was confirmed by Employer's other witness, Mr. Lawrence Philyaw. Philyaw, Claimant's immediate supervisor, testified that Claimant never complained that he needed additional accommodations for his light-duty assignment.

In response to Employer's case, Claimant testified on two occasions. He explained the nature of his injury, testified about his light-duty assignment, which confirmed the account of Employer's witnesses, and he testified about his medical treatment.

Claimant first saw Dr. Avart on November 2, 1998, and he has seen Dr. Avart on a monthly basis ever since. Claimant believed that the cortisone injections provided relief. However, he terminated his thrice-weekly water therapy because it did not help. Claimant described pain that started in his lower back and involved his heels and kneecaps. Claimant said he did not sleep well because of discomfort from the back brace. He testified that he could not perform Employer's light-duty assignment because it required too much manual labor. Claimant asserted that after his surgery on April 7, 2000, his leg spasms ceased. However, he still experienced lower back cramps on the right side and shooting pain when he bent or twisted too much.

Claimant also presented the testimony of Dr. Avart, who was deposed on March 2, 1999. Dr. Avart first saw and examined Claimant on November 2, 1998. Dr. Avart found Claimant to be experiencing spasms in the lower lumbar spine, which extended into the sacroiliac regions. Claimant walked with an unsteady gait and complained of numbness and tingling into his feet. Dr. Avart found spondylolysis of L5, with minimal slippage of one vertebra on another. Dr. Avart agreed that the March 19, 1998, MRI showed no impingement on Claimant's nerve root. Dr. Avart also testified that this MRI did not show acute injury, fracture, dislocation or subluxation. It did, however, show a small disc herniation at the L5/S1 point in Claimant's spine.[6] Dr. Avart agreed with Dr. Bonner that the findings were normal from the July EMG. Further, Dr. Avart did not challenge Dr. Bonner's finding that in July, 1998, Claimant's physical examination was normal.

As of Claimant's visit on November 2, 1998, it was Dr. Avart's "impression" that Claimant had a herniated lumbar disc and lumbar radiculopathy. R.R. 395a. Dr. Avart referred Claimant to Dr. Cohen for radiological testing in November 1998, which showed lumbrosacral radiculopathy.[7] Claimant's May 1998 EMG was normal, in Dr. Avart's opinion, because it can take months for a stretch injury to a nerve to develop and produce a positive finding. Indeed, Dr. Avart believed that Claimant's

---

5. Claimant's finished reports were carried to the work center, but not by Claimant. Gola explained that Claimant's workday was spent on the ground floor of the building; access to the building required about four or five steps from the parking lot to the building entrance.

6. As noted by Dr. Levin in his report of September 11, 2000, Dr. Avart's statement on the disc herniation is unclear because he did not identify the date of the MRI showing a disc

herniation or whether the herniation was causing neural compression. In Dr. Levin's opinion, the March 1998 MRI did not show disc herniation, an opinion confirmed by the radiologist who reviewed the films.

7. It is not clear from the record whether Dr. Cohen performed an MRI or EMG in November 1998. Neither report is in the certified record.

nerve injury was still evolving as of 1999. Dr. Avart concluded that Claimant had ongoing lumbosacral radiculopathy. In sum, Dr. Avart's final diagnosis was post-traumatic lumbar radiculopathy and two herniated disks at L5–S1. Dr. Avart further opined that it was unlikely that Claimant would be able to go back to any medium or heavy labor job in the future.

Claimant also presented the medical deposition testimony of Evan D. O'Brien, M.D., a board-certified orthopedic surgeon, who first saw Claimant on November 18, 1999. Dr. O'Brien took a medical history from Claimant but never reviewed any of the reports or records of Claimant's other treating physicians. Dr. O'Brien opined that Claimant suffered a pre-existing degenerative condition and a pre-existing spondylolisthesis. A discogram on Claimant's L4–L5 was negative. Nevertheless, Dr. O'Brien performed back surgery on Claimant to treat his subjective back pain. Dr. O'Brien opined that Claimant could perform sedentary work, but he could not lift objects weighing more than fifteen pounds and must be allowed to change positions frequently.

On May 23, 2003, the WCJ issued a decision denying Employer's termination and utilization review petitions. The WCJ redefined Claimant's injury to include posttraumatic lumbar radiculopathy and two herniated discs at L5–S1. He also found that Employer did not sustain its burden of proving that Dr. Avart's treatment was not reasonable and necessary. Litigation costs were also awarded to Claimant's attorney. Employer appealed to the Board, and it affirmed. Employer then filed the instant petition for review.[8]

On appeal, Employer seeks a reversal. To that end, it raises four arguments. First, the Board erred in affirming the WCJ because Employer provided by competent, substantial evidence that Claimant had recovered from his February 1998 back strain. Second, the Board erred because the injury from which Claimant was found not to have recovered, disc herniation and lumbar radiculopathy, had never been accepted by Employer. Third, the Board misapplied this Court's holding in *Samson Paper Company & Fidelity Engraving v. Workers' Compensation Appeal Board (Digiannantonio)*, 834 A.2d 1221 (Pa.Cmwlth.2003) to the WCJ's decision. Fourth, the Board erred in affirming the WCJ's conclusion that Employer did not satisfy its burden of proof with respect to the utilization review petition.

■ Section 306(a) of the Workers' Compensation Act[9] provides that an injured claimant is no longer entitled to compensation when his work-related disability has ceased. In a termination proceeding, the burden of proof is upon the employer to prove that the claimant is fully recovered from his work-related injury. *Udvari v. Workmen's Compensation Appeals Board (USAir, Inc.)*, 550 Pa. 319, 705 A.2d 1290 (1997). An employer meets this burden when its medical expert

> unequivocally testifies that it is his opinion, within a reasonable degree of medical certainty, that the claimant is fully

8. This Court's scope of review is limited to determining whether there has been a violation of constitutional rights, errors of law committed, and whether necessary findings of fact are supported by substantial evidence. *Lehigh County Vo–Tech School v. Workmen's Compensation Appeal Board (Wolfe)*, 539 Pa. 322, 652 A.2d 797 (1995). Substantial evidence is such relevant evidence as a reason-

able mind might accept as adequate to support a conclusion. *Mrs. Smith's Frozen Foods v. Workmen's Compensation Appeal Board (Clouser)*, 114 Pa.Cmwlth.382, 539 A.2d 11 (1988).

9. Act of June 15, 1915, P.L. 736, *as amended*, 77 P.S. § 511(1).

recovered, can return to work without restrictions and that there are no objective findings which either substantiate the claims of pain or connect them to the work injury.

*Udvari,* 550 Pa. at 327, 705 A.2d at 1293.

Here, Employer presented competent medical evidence that Claimant had recovered from his accepted work injury, which was described as a "lower back strain." Both Drs. Bonner and Levin testified that, at the time of their respective examinations, Claimant exhibited no symptoms or residual complications from the lower back strain he suffered on February 28, 1998. Their observations were confirmed by a March 1998 MRI and July 1998 EMG, which showed an absence of nerve damage, including radiculopathy, but did show spondylolysis and spondylolisthesis. However, these latter conditions were likely present since birth and unrelated to Claimant's February 1998 back strain.[10] The opinions of Employer's medical experts that Claimant had recovered from his lumbar strain were unequivocal. In short, the testimony of Employer's experts satisfied each factor in the *Udvari* standard. However, after reading the deposition testimony of Employer's experts, Drs. Bonner and Levin, the WCJ found them not to be credible.

■ The WCJ has the exclusive authority to make credibility determinations. Where a WCJ makes credibility determinations on the basis of deposition testimony, the WCJ must do more than simply announce one expert "more credible and persuasive" than another. *Daniels v. Workers' Compensation Appeal Board (Tristate Transport),* 574 Pa. 61, 78, 828 A.2d 1043, 1053 (2003). As explained by our Supreme Court,

Absent the circumstance where a credibility assessment may be said to have been tied to the inherently subjective circumstance of witness demeanor, some articulation of the actual objective basis for the credibility determination must be offered for the decision to be a "reasoned" one which facilitates effective appellate review.

*Id.* at 78, 828 A.2d at 1053. In this case, all the medical experts testified by deposition.

■ The WCJ's credibility findings do not meet the *Daniels* standard. The question before the WCJ was whether Claimant had recovered from his back strain as of September 9, 1998. The WCJ discredited Dr. Levin's testimony for the stated reason that Dr. Levin only "saw" Claimant one time. The physical examination of a patient is a diagnostic tool that has stood the test of time, beginning at least as early as recorded human history. However, modern science has supplemented this tool with others more appropriate to the diagnosis of a nerve injury, such as radiculopathy, which cannot be detected by eyesight or by palpation. Claimant's EMG and MRI, each done prior to September 9, 1998, confirmed a lack of any nerve damage. The WCJ offered no reason to explain his belief that more physical exams were required, particularly in light of the EMG and MRI test results that confirmed Employer's experts, in order for Dr. Levin to establish his credibility. The WCJ dismissed Dr. Bonner's testimony as incredible because Dr. Bonner "admitted" that a trauma could aggravate degenerative bone disease. This "admission" merely states the obvious; indeed, a trauma may injure healthy bones. In no way does this statement of Dr. Bonner, which speaks to a general and irrefutable proposition, contra-

---

10. Dr. O'Brien also described these condi- tions as pre-existing.

dict his opinion with respect to Claimant's condition as of September 9, 1998.

In contrast, the WCJ credited Drs. Avart and O'Brien, who did not see Claimant until long after Claimant had been found to have recovered in the opinion of Drs. Bonner and Levin. Dr. Avart's opinion that Claimant's lumbar radiculopathy was related to his February 1998 injury was based upon an EMG performed many months after this incident.[11] The WCJ found Dr. Avart credible because he saw Claimant throughout his treatment period, i.e., November 1998 to the date of his deposition in March 1999. Dr. O'Brien opined that Claimant suffered "pre-existing" degenerative bone disease and spondylolisthesis. The WCJ did not offer any reason for crediting Dr. O'Brien's testimony over that of Employer's expert. The WCJ simply accepted Dr. O'Brien's diagnostic analysis.[12]

Neither Dr. Avart nor Dr. O'Brien believed at the time of their depositions that Claimant could return to a job requiring heavy manual labor. However, Dr. O'Brien opined that Claimant could do a sedentary job that allowed him the ability to move about, i.e., a position remarkably similar to that given to Claimant by Employer prior to Claimant's departure on June 15, 1998.

There are two problems with the record in this case. First, the WCJ, who issued his decision prior to our Supreme Court's holding in Daniels, did not explain his reasons for assigning 100% credibility to Drs. Avart and O'Brien, and 0% credibility to Employer's experts. This has impeded

effective appellate review. Second, even accepting Claimant's experts as 100% credible, their testimony does not relate to the issue raised in Employer's termination petition, i.e., whether Claimant had recovered from his back "strain" as of September 9, 1998. Employer's expert testimony was not refuted by Claimant's experts because they testified about a medical condition not contained in the NCP. Claimant's experts may have established the existence of herniated discs and lumbar radiculopathy, but these conditions were not accepted by Employer in the NCP. As such, the testimony of Claimant's experts was irrelevant.

Before Claimant's herniated discs and lumbar radiculopathy could be found compensable, it was incumbent upon Claimant to file a review petition to amend the June 1998 NCP or to file a claim petition to establish that his herniated discs and radiculopathy resulted from his February 1998 accident. In the absence of either petition, the testimony of either of Claimant's experts was irrelevant to the question of whether Claimant had recovered from his back strain as of September 9, 1998. Nevertheless, the Board found that by authority of Samson Paper Company & Fidelity Engraving v. Workers' Compensation Appeal Board (Digiannantonio), 834 A.2d 1221 (Pa.Cmwlth.2003), the WCJ was authorized to change the NCP to include disc herniation and lumbar radiculopathy. We disagree.

In Samson Paper, we considered the meaning of Section 413(a) of the Workers' Compensation Act, 77 P.S. § 771, which provides that an NCP may be changed

---

**11.** Dr. Levin testified that Dr. Avart improperly relied upon a 15–month old EMG. It is not clear from the record to which EMG Dr. Avart was referring in his testimony. Unfortunately, the record does not contain the reports of the various radiological studies on Claimant.

**12.** Dr. O'Brien found a "pars defect," that usually starts at age 7, and pre-existing spondylolisthesis. He opined that the February 1998 injury caused a pars disruption that led to a progressive increase in pain.

upon petition filed by either party ... or in the course of the proceedings under any petition pending before such [WCJ], if it proved that such [NCP] ... was in any material respect incorrect.

As we have explained, the WCJ's power to modify an NCP is limited. *Jeanes Hospital v. Workers' Compensation Appeal Board (Hass)*, 819 A.2d 131 (Pa.Cmwlth. 2003). The mistake must relate to a condition that existed at the time "the agreement expressed in the NCP was executed." *Id.* at 134.

The WCJ in *Samson Paper* found that the claimant proved that the NCP was materially incorrect at the time it was issued. In that case, an EMG done shortly after the claimant's work-related accident revealed carpal tunnel syndrome. Thus, we affirmed the WCJ's decision to modify the NCP even though the claimant had not filed a review petition. The WCJ specifically found that the claimant "met her burden of proof that in addition to a neck and upper back injury as a result of the work injury ... she also sustained ... carpal tunnel syndrome...." *Samson Paper*, 834 A.2d at 1224.

■ This case is distinguishable from *Samson Paper*. Here, Claimant did not produce an MRI or EMG contemporaneous with his injury that showed nerve damage. By contrast, the claimant in *Samson Paper* produced such objective evidence with respect to her carpal tunnel syndrome. Further, the WCJ in this case did not specifically conclude that Claimant sustained his burden of proving that his herniated disc and lumbar radiculopathy were caused by the February 1998 accident. Finally, the WCJ did not make the express finding that the NCP issued by Employer was incorrect. Rather, the WCJ simply concluded that Employer did not meet its burden of proving recovery, glossing over the difference between a muscle strain and a herniated disc with attendant radiculopathy.

A lower back strain is not the same as disc herniation and lumbar radiculopathy. They are separate and discrete conditions. *See, e.g., Indian Creek Supply v. Workers' Compensation Appeal Board (Anderson)*, 729 A.2d 157 (Pa.Cmwlth.1999). It may be that the February 1998 incident led Claimant over time to develop these latter conditions. This requires the filing of a claim petition before benefits may be granted for these conditions. In any event, it is the claimant's burden of proof in any case where an injury, other than the one identified in the NCP, is asserted to be compensable.

Here, the WCJ did not acknowledge that Claimant had a burden of proof let alone find that Claimant satisfied his burden. *Samson Paper* allows the WCJ to revise an NCP only in the narrow circumstances of a mistake that was made on the date the NCP was issued. Were we to accept the Board's understanding of *Samson Paper*, a claimant would never have to file a claim petition to obtain compensation for an injury that develops over time but is not present when the NCP is issued. However, the procedures in the Workers' Compensation Act are not to be disregarded. The WCJ erred in changing the NCP to include lumbar radiculopathy without any evidence in the record that it existed as of June 11, 1998, when the NCP was issued. To the contrary, Dr. Avart's testimony confirmed that Claimant did not have nerve damage as of July 11, 1998.

The credibility determinations made by the WCJ do not meet the standard established by our Supreme Court in *Daniels*. We cannot fault the WCJ because *Daniels* had not been decided at the time the WCJ issued his decision. We are constrained to vacate the Board's order and remand for further findings by the WCJ. The WCJ

must explain his reasons for finding Drs. Bonner and Levin not to be credible or persuasive and for finding Dr. Avart and Dr. O'Brien credible. Until these findings are made in a manner consistent with the requirements of *Daniels,* we cannot undertake effective appellate review of the Board's decision to affirm the WCJ's denial of Employer's petitions.[13]

For these reasons, we vacate and remand.

### ORDER

AND NOW, this 18th day of October, 2004, the adjudication of the Workers' Compensation Appeal Board dated February 11, 2004, is hereby vacated and remanded for further proceedings in accordance with this opinion.

Jurisdiction relinquished.

---

**13.** If Employer succeeds upon remand in having its termination petition granted, its utiliza-tion review petition will be moot, as will the WCJ's award of counsel fees.