IN THE COMMONWEALTH COURT OF PENNSYLVANIA

The Pennsylvania State University,    :
                        Petitioner    :
                                        :
          v.                       :   No. 1425 C.D. 2021
                                          :   Submitted: October 11, 2022
John Ward (Workers' Compensation    :
Appeal Board),                      :
                     Respondent    :

BEFORE:    HONORABLE CHRISTINE FIZZANO CANNON, Judge
                 HONORABLE LORI A. DUMAS, Judge
                 HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge

<u>OPINION NOT REPORTED</u>

MEMORANDUM OPINION
BY JUDGE DUMAS                              FILED: February 22, 2023

       The Pennsylvania State University (Penn State) has petitioned this Court to review an adjudication of the Workers' Compensation Appeal Board (Board). We discuss the procedural posture in further detail below, but essentially John Ward (Ward) filed a petition for workers' compensation benefits, which the Workers' Compensation Judge (WCJ) had denied. The Board reversed the WCJ. On appeal, Penn State contends that the Board erred by substituting the WCJ's factual findings with its own. Upon review, we are constrained to vacate the decisions and orders at issue and remand for a revised decision by the WCJ, which must more explicitly identify which testimony the WCJ found credible.

## I. BACKGROUND

       Penn State employed both Ward as a maintenance worker and his fiancée, who was divorced.[1] Ward's fiancée typically met her ex-husband in a Penn

---

[1] We state the generally undisputed facts. Because Penn State has alleged that the Board

State parking lot to exchange custody of their minor child. In 2017, Ward was at Penn State when he witnessed his fiancée's ex-husband kill her and then commit suicide. The police arrived, including Pennsylvania State Trooper Patrick Thomas (Thomas), the lead investigator, who interviewed Ward shortly thereafter.

In 2018, Ward filed a claim petition requesting temporary total disability benefits. Prior to the WCJ's initial hearing, the parties stipulated that Ward witnessed the murder/suicide and consequently suffered post-traumatic stress disorder. The WCJ held several hearings.

## A. Ward's Testimony

Ward testified that as a general maintenance helper, he resolved "any maintenance requests or concerns in the dorms." N.T. Hr'g, 5/1/18, at 13. During the course of the day, Ward would be in the dorm and dining hall, as needed. *Id.* Ward usually did his rounds of the dorm during the afternoon between 2:00 and 4:00 p.m., which is when he walked "from window to window, floor to floor." *Id.* at 15, 41, 46. After finishing his rounds each afternoon, Ward would walk from the dorm to the dining hall to pick up any maintenance requests from his mailbox. *Id.* at 14, 22. Ward usually checked his mailbox shortly before his scheduled afternoon break at 3:00 p.m., although occasionally his break started as early as 2:30 p.m. or as late as 4:00 p.m., or was cancelled altogether, depending on the events that day. *Id.* at

---

improperly substituted its findings of fact for the WCJ's findings of fact, we summarize the disputed testimony below. We note that the WCJ's April 30, 2019 decision did not clearly explain that the WCJ was summarizing each party's *interpretation* of the testimony. *Compare* WCJ's Decision, 4/30/19, at 4 (notating that section as Ward's counsel's version of events), *with id.* at 19 (signaling the beginning of Penn State's counsel's narrative), *and id.* at 44 (start of the WCJ's *own* findings of fact). Because the WCJ's decision used two different pagination sequences and the parties used the pagination at the bottom of the page, we also do the same. Finally, we add that Ward's fiancée was a chef, and her shift ended at 3:00 p.m. Notes of Testimony (N.T.) Hr'g, 5/1/18, at 24-25.

22-23; N.T. Hr'g, 7/3/18, at 15. Ward almost always picked up refreshments in the dining hall before returning to the dorm for his break. N.T. Hr'g, 5/1/18, at 43.

Because the custody exchange occurred around the same time that Ward did his rounds, Ward explained that he saw the custody exchange "[m]aybe once or twice in passing," specifically at 3:15 p.m., if the ex-husband was on time or later if the ex-husband was late. N.T. Hr'g, 5/1/18, at 41; N.T. Hr'g, 7/3/18, at 15. Ward denied making "it a purposeful part of [his] day to make sure that [he] would be available" during the custody exchange. N.T. Hr'g, 5/1/18, at 41.[2] Ward agreed that "monitoring or participating in custody exchanges" was not part of his job. N.T. Hr'g, 7/3/18, at 10-11.

In the mid-afternoon of December 13, 2007, Ward testified that he was changing a toilet seat, when his fiancée texted Ward that the ex-husband was late. *Id.* at 18. Ward stated that around 15 minutes later, he was in the maintenance room putting his tools away before he began his "afternoon rounds through the dorms, which [he] did every day." N.T. Hr'g, 5/1/18, at 15; N.T. Hr'g, 7/3/18, at 18.

Ward testified that it was around 3:00 p.m. when he "got to the end of the hall on the second floor, [and he] noticed [the ex-husband's] vehicle pulling in, [and] the child exchange usually only lasted about 15 seconds, so [he] took [his] time going down the steps." N.T. Hr'g, 5/1/18, at 15-16. Ward explained that he was "trying to go to break that day, and [he] ended up late." *Id.* at 16. Ward clarified that he was not specifically looking out the second-floor window, but was walking toward the stairs when he "glanced out the window and saw [the ex-husband's] vehicle pulling in." *Id.* at 45-46. Ward stated he was on his way to the office to

---

[2] On cross-examination, in response to the question, "And on prior occasions, had you positioned yourself in such a location so that you could observe" the custody exchange, Ward responded, "Very few." N.T. Hr'g, 7/3/18, at 16.

check his mailbox for maintenance requests. *Id.* at 17, 22; N.T. Hr'g, 1/8/19, at 38.

Ward testified that he used "the emergency exit, which [he] did quite often, got to the bottom of the steps," and the ex-husband shot Ward's fiancée. N.T. Hr'g, 5/1/18, at 15; N.T. Hr'g, 1/8/19, at 38. Ward agreed with counsel's question that it was only when Ward was exiting the dorm that he became "aware that something terrible was happening." N.T. Hr'g, 7/3/18, at 19. Ward denied seeing anything that would give him concern, including a drawn gun, when he looked out from the second story window. *Id.* at 20-21. Lastly, Penn State cross-examined Ward regarding his interview with Thomas, and Ward generally denied recalling making various statements to Thomas. N.T. Hr'g, 7/3/18, at 37-43.

### B. Thomas' Testimony

Penn State introduced the trial deposition testimony of Thomas. N.T., Hr'g, 1/8/19, at 7; N.T. Thomas Dep., 8/14/18, at 8. Thomas testified that he interviewed Ward within an hour of the homicide, and Thomas both audio-recorded (with Ward's permission) and took notes during the interview. N.T. Thomas Dep. at 14, 18, 26. In Thomas' view, Ward was forthcoming about his observations but also was "extremely distraught [and] very emotional." *Id.* at 18, 42. Thomas agreed it was possible that given Ward's emotional state, Ward may have misspoken or "there was some misinterpretation" as to, *e.g.*, whether Ward was on the second floor or exiting the first floor when he saw the shooting. *Id.* at 44.

According to Thomas, Ward stated that the custody exchange was scheduled for 3:15 p.m., but that the ex-husband was "usually always 30 minutes late." *Id.* at 21, 26. Ward explained that because the ex-husband was "unstable," Ward would watch the exchange from the dorm. *Id.* at 23. Thomas stated that it was his understanding that Ward "would watch every custody exchange," usually from

the second story window of the dorm.  *Id.* at 26-27.[3]  Ward explained that his fiancée would text him when the exchange was occurring and that they "were texting back and forth between [(sic) the ex-husband's] arrival."  *Id.* at 27-28.

On December 13, 2017, according to Thomas, Ward checked his cell phone and said that his fiancée walked outside and was in her car at 3:08 p.m.  *Id.* at 28.[4]  Per Thomas, Ward texted his fiancée, "Why are you not staying in the building?" and that he saw the ex-husband arrive from the second-story window.  *Id.* at 28-29.  Ward saw the ex-husband exit his vehicle with Christmas presents, approach the fiancée's vehicle, hand the presents to the fiancée, and as the fiancée turned to put the presents in her vehicle, the ex-husband shot the fiancée sometime before 3:38 p.m.  *Id.* at 11, 29.  "Ward further related that he ran downstairs as fast as he could and exited through the emergency exit."  *Id.* at 29, 30-31.  Thomas agreed that Ward "always maintained that [Ward] saw the whole interaction" and that "it seems that it's indicated [Ward] observed the shooting [from] the second floor[.]"  *Id.* at 42-43.

Thomas testified that the police interviewed two other individuals about their recollection.  *Id.* at 35, 37.  Thomas stated that the individual he personally interviewed did not indicate that Ward was outside during the actual shooting.  *Id.*

In sum, before the WCJ, Ward testified that he was leaving the dorm and was on his way to the dining hall office to check his mailbox for maintenance requests when he saw his fiancée killed.  N.T. Hr'g, 5/1/18, at 15; N.T. Hr'g, 1/18/19,

---

[3] Precisely, Thomas explained that it "was [his] understanding in talking with [Ward] that he would watch every custody exchange.  And [the ex-husband] was always 30 minutes late when it came time."  N.T. Thomas Dep. at 26; *id.* at 23 ("And [Ward] would just watch from [the dorm] to make sure that the exchange went without any complications.").  Thomas agreed that "it [was his] understanding that this was information Mr. Ward knew personally[.]"  *Id.* at 26.

[4] Apparently, Ward's fiancée texted Ward of her action.

at 38. In contrast, per Thomas, Ward was not on his way to the office, but was watching the custody exchange from the second floor when the shooting occurred, which prompted Ward to run downstairs as fast as he could. N.T. Thomas Dep. at 28-29; *see also* N.T. Thomas Dep., Ex. 1.[5]

## C. Subsequent Procedural History

The WCJ denied Ward's petition because Ward failed to establish that he was injured during an activity that furthered the interests of Penn State. WCJ's Decision, 4/30/19, at 44, 46. The WCJ found that Ward and Thomas *both* credibly testified. *Id.* The WCJ held, as a conclusion of law, that Ward "failed to establish

---

[5] Only a partial copy of Thomas' incident report was made part of the record. N.T. Thomas Dep., at Ex. 1 (partial copy of Thomas' incident report). For completeness' sake, we quote the relevant excerpt from Thomas' incident report:

> Ward related that [the ex-husband] is supposed to return at 1515 hours with [the child]. However, he is usually always 30 minutes late. Ward further related that he works in the dorms as part of his job. Ward continued to relate that he stands in the second-floor window of [the dorm] to watch the exchange between [the ex-husband] and [the fiancée]. Ward related that [his fiancée] usually texts him to let him know the exchange is happening. Ward continued to relate that he watches the exchange because [the ex-husband] has become unstable since [the fiancée] left him. Ward related that he and [the fiancée] were texting back and forth before [the ex-husband's] arrival. Ward related that at 1508 hours, [his fiancée] walked outside and sat in her car. Ward continued to relate that he texted [his fiancée] and asked "why are you not staying in the building?" Ward related that while he was standing in the second story window, he observed [the ex-husband] pull into the parking lot in his white Tahoe. Ward related that [the ex-husband] exited his vehicle with Christmas presents in his hands. Ward continued to relate that [the ex-husband] walked over to [the fiancée's vehicle] and handed her the presents, Ward related that as [the fiancée] turned to put the presents in her vehicle, [the ex-husband] shot her. Ward further related that [the ex-husband] had shot [the fiancée] with a handgun. Ward continued to relate that [the ex-husband] then turned and shot himself. Ward further related that he ran down the stairs as fast as he could and exited through the emergency exit. Ward related that he ran towards [his fiancée] and rolled her over to see if she was alive. Ward related that she was already dead.

*Id.* (cleaned up).

that his monitoring of, and involvement with, the custody exchange giving rise to this claim has been related to his employment, and that this activity advanced [Penn State's] interests." *Id.* at 46. The WCJ also held that Ward failed to establish that his actions fell within the scope of the personal comfort doctrine and that Penn State successfully invoked the personal animus defense because the ex-husband targeted Ward. *Id.* at 46-47.[6] Ward timely appealed to the Board.

The Board reversed, reasoning that Ward properly invoked the personal comfort doctrine and that Penn State failed to establish the affirmative defense of personal animus. Bd.'s Dec., 6/25/20, at 8-9, 11. The Board acknowledged the WCJ's finding that *both* Ward and Thomas credibly testified. *Id.* at 8. The Board did not address that finding but merely recounted that Ward "received and responded to texts from [his fiancée], continued with his duties and was on the way from [the dorm] to his [office] mailbox when he" witnessed the shooting. *Id.* at 9.[7] The Board concisely reasoned that Ward was not engaged in a "pronounced and significant departure from work responsibilities" or "in a premediated, extreme and inherently high-risk action wholly foreign to his employment." *Id.* The Board summarily concluded that Ward's "injury occurred in the course of [his] employment . . . ." *Id.* The Board reversed and remanded to the WCJ. *Id.* at 12. One commissioner

---

[6] The "personal comfort doctrine" "recognizes that momentary departures from the work routine do not remove an employee from the course of his employment. Breaks which allow the employee to administer to his personal comfort better enable him to perform his job and are therefore considered to be in furtherance of the employer's business." *Henderson v. WP Ventures, Inc. (Workers' Comp. Appeal Bd.)*, 269 A.3d 1272, 1276 (Pa. Cmwlth. 2022) (cleaned up). "The personal animus exception is an affirmative defense to rebut the presumption that an injury that occurs on the employer's premises is work-related . . . . For the personal animus exception to apply there must be some intention on the part of the assailant to inflict the injury for personal reasons." *M & B Inn Partners, Inc. v. Workers' Comp. Appeal Bd. (Petriga)*, 940 A.2d 1255, 1259 (Pa. Cmwlth. 2008) (cleaned up).

[7] Although the Board summarized the conflicting testimony of Ward and Thomas, *compare* Bd.'s Decision, 6/25/20, at 6, *with id.* at 7, the Board did not otherwise resolve the conflict.

dissented and would have affirmed, reasoning that Ward "was not furthering his employment at the time of injury." *Id.*[8] Penn State filed a timely petition for review in this Court. Pet. for Rev., 12/27/21.

## II. ISSUES

Penn State raises four issues. First, Ward was not acting in the course of his employment when he monitored his fiancée's custody exchange. Second, Penn State established the personal animus doctrine. Third, the Board should have remanded to have the WCJ justify the findings that both Ward and Thomas testified credibly. Fourth, the Board erred by reversing the suspension of Ward's benefits.

## III. ANALYSIS[9]

In support of its first issue, Penn State argues that the Board misapprehended the law regarding the course and scope of employment. Penn State's Br. at 33. In Penn State's view, it is well settled that the initial inquiry is whether Ward "was actually engaged in the furtherance of an employer's business or affairs, or the injury occurred during an inconsequential or innocent departure from work during working hours." *Id.* at 34 (cleaned up).[10]

---

[8] The WCJ complied with the remand and both parties timely appealed to the Board. WCJ's Decision, 3/15/21; Penn State's Notice of Appeal, 3/31/21; Ward's Notice of Appeal, 4/1/21. The Board affirmed in part and reversed in part, essentially denying relief to Penn State and granting relief to Ward. Bd.'s Decision, 12/1/21.

[9] In a workers' compensation appeal, our review is limited to determining whether an error of law was committed, whether constitutional rights were violated, and whether necessary findings of fact are supported by substantial evidence. *Bryn Mawr Landscaping Co. v. Workers' Comp. Appeal Bd. (Cruz-Tenorio)*, 219 A.3d 1244, 1252 n.5 (Pa. Cmwlth. 2019) (citation omitted).

[10] Ward counters that the WCJ and the Board credited his testimony. Ward's Br. at 31. Ward argues that the WCJ held that he was working for Penn State at the time of the shooting. *Id.* at 31-32. Ward rejects any suggestion of a conflict between his testimony and Thomas' testimony. *Id.* at 32. In support, Ward points to Thomas' testimony that because of Ward's emotional state, Ward could have misspoke. *Id.* at 32-33. Ward emphasizes that Penn State failed to identify any conflicting facts that he was acting outside the scope of his employment. *Id.* at 33.

Before addressing whether Ward was injured in the course and scope of his employment, we must resolve which testimony the WCJ credited in denying benefits. By way of background, we liberally construe the Workers' Compensation Act (Act)[11] and its humanitarian objective in order to benefit workers. *Kmart Corp. v. Workers' Comp. Appeal Bd. (Fitzsimmons)*, 748 A.2d 660, 664 (Pa. 2000). The Act, however, "was not intended to make the employer an insurer of its employees' lives and health." *Id.* (citation omitted).

Generally, the WCJ, and not the Board or this Court, acts as the "exclusive arbiter of credibility . . . ." *IA Constr. Corp. v. Workers' Comp. Appeal Bd. (Rhodes)*, 139 A.3d 154, 161 (Pa. 2016) (cleaned up). A WCJ faced with conflicting evidence, "must adequately explain the reasons for rejecting or discrediting competent evidence." Section 422(a) of the Act, 77 P.S. § 834. The WCJ thus must issue a "reasoned decision" "so that this Court does not have to 'imagine' the reasons why a WCJ finds that the conflicting testimony of one witness was more credible than the testimony of another witness." *Amandeo v. Workers' Comp. Appeal Bd. (Conagra Foods)*, 37 A.3d 72, 76 (Pa. Cmwlth. 2012).

When witnesses have testified live, a "mere conclusion as to which witness was deemed credible . . . could be sufficient to render the [WCJ's] decision adequately reasoned." *Daniels v. Workers' Comp. Appeal Bd. (Tristate Transp.)*, 828 A.2d 1043, 1053 (Pa. 2003) (cleaned up). When parties introduce deposition testimony into the record, the WCJ must articulate "the actual objective basis for [the WCJ's] credibility determination" in order for the decision to be "adequately reasoned." *Id.* With respect to the "actual objective basis," "there are countless objective factors which may support the [WCJ's] decision to accept certain evidence

---

[11] Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. §§ 1-1041.4, 2501-2710.

9

while rejecting" conflicting testimony. *Id.* (cleaned up). For example, "other evidence in the record may provide the objective support necessary" to explain the WCJ's credibility determinations when presented with conflicting deposition testimony. *Amandeo*, 37 A.3d at 76.

If the Board or this Court is unable to resolve the WCJ's credibility determinations, then either tribunal may remand to the WCJ for clarification. *See* Section 419 of the Act, added by the Act of June 26, 1919, P.L. 642, 77 P.S. § 852; *City of Phila. v. Workers' Comp. Appeal Bd. (Smith)*, 860 A.2d 215, 224 (Pa. Cmwlth. 2008) (*Smith*). Thus, for example, the *Smith* Court remanded because the WCJ apparently did not provide any articulable, objective reasons for finding the testimony of two medical experts more credible than the testimony of two adverse experts. *Smith*, 860 A.2d at 221, 223-24. On the other hand, when the WCJ reviewed conflicting deposition testimony and contrasted the deponents' description of the injury's severity, we held that the WCJ had "clearly articulated objective bases for his credibility determinations." *Gumm v. Workers' Comp. Appeal Bd. (J. Allan Steel)*, 942 A.2d 222, 228 (Pa. Cmwlth. 2008). The *Gumm* Court did not have to "imagine" the reasons as to why the WCJ found certain conflicting deposition testimony more credible than other testimony. *See id.*; *Amandeo*, 37 A.3d at 76.

Instantly, as noted above, the WCJ had to reconcile conflicting testimony. Specifically, Thomas' deposition testimony that Ward watched the custody exchange from the second floor when he saw the shooting, in contrast to Ward's in-person testimony that he was exiting the dorm on his way to the office when he saw the shooting. *Compare* N.T. Thomas Dep., 8/14/18, at 29-31, 42-43, *with e.g.*, N.T. Hr'g, 5/1/18, at 17, 22; N.T. Hr'g, 1/18/19, at 38.

If the WCJ credited Thomas' testimony, then Ward's action was

unrelated to his employment. But if the WCJ credited Ward's testimony, then the WCJ presumably would have held that Ward was acting in the course of his employment (and not monitoring the custody exchange) when he witnessed his fiancée's shooting, and the WCJ would have granted Ward's claim petition.

Faced with conflicting testimony, the WCJ held that Ward's testimony "has been deemed credible[] and accepted" and Ward's petition "had not been denied for lack of credibility on his part" but for other reasons. WCJ's Decision, 4/30/19, at 44. The WCJ also held that to "the extent applicable, the testimony of . . . Thomas has been deemed credible, and accepted, as there has been no evidence advanced to suggest that . . . Thomas has misrepresented any aspect of his testimony. Additionally, the testimony of . . . Thomas is supported by all aspects of his investigation." *Id.* at 46.

Despite crediting Ward's (and Thomas') testimony, the WCJ nonetheless held that Ward "failed to establish that his monitoring of, and involvement with, the custody exchange giving rise to this claim has been related to his employment, and that this activity advanced [Penn State's] interests." *Id.* Somewhat confusingly, the WCJ also opined that Ward's "vantage point from the second floor window" was *not* dispositive of the claim petition. *Id.* But whether Ward monitored the custody exchange from the second floor window appears material to resolving his claim petition. It is material because if Ward's injury occurred while he was watching the custody exchange, *i.e.*, outside the course and scope of his employment, then he is due no relief. *See Henderson*, 269 A.3d at 1276.

Because of the WCJ's conflicting credibility findings and failure to detail which testimony the WCJ found credible, the Board should have remanded to the WCJ for clarification. *See* 77 P.S. § 852; *Smith*, 860 A.2d at 224. *Compare* Bd.'s

11

Decision, 6/25/20, at 6, *with id.* at 7. Absent the WCJ's clarification, we cannot reconcile the WCJ's credibility determinations with the WCJ's denial of relief. Because the WCJ denied relief, we could intuit that the WCJ found not credible Ward's testimony that he witnessed the shooting as he exited the dorm. But that inference would be in tension with the WCJ's statement that Ward's second floor vantage was not dispositive.

## IV. CONCLUSION

For these reasons, we vacate the Board's decisions dated June 25, 2020, and December 1, 2021. We remand to the Board with instructions to (a) vacate the WCJ's decisions dated April 30, 2019, and March 15, 2021, and (b) promptly remand to the WCJ to draft, within 30 days of the Board's remand, a new decision that complies with *Daniels*, including identifying which testimony it found credible. The WCJ should not adopt any of the parties' proposed findings of fact and conclusions of law, to the extent they conflict. Jurisdiction relinquished.

_____
LORI A. DUMAS, Judge

12

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

The Pennsylvania State University,   :
                        Petitioner   :
                                     :
        v.                           :   No. 1425 C.D. 2021
                                     :
John Ward (Workers' Compensation     :
Appeal Board),                       :
                        Respondent   :

# **O R D E R**

AND NOW, this 22nd day of February, 2023, we vacate the decisions of the Workers' Compensation Appeal Board (Board) dated June 25, 2020, and December 1, 2021. We remand to the Board with instructions to (a) vacate the decisions of the Workers' Compensation Judge (WCJ) dated April 30, 2019, and March 15, 2021, and (b) promptly remand to the WCJ to draft, within 30 days of the Board's remand, a new decision explicitly detailing which testimony it found credible or not credible in accordance with *Daniels v. Workers' Compensation Appeal Board (Tristate Transport)*, 828 A.2d 1043 (Pa. 2003). For clarity, the WCJ's decision should not verbatim adopt any conflicting findings of fact and conclusions of law.

Jurisdiction relinquished.

_____
LORI A. DUMAS, Judge